FILED: JUNE 26, 2008
08CV3671
JUDGE MANNING
MAGISTRATE JUDGE COLE
EDA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

---

| | |
|---|---|
| ROCHELLE BROMUND, | **COMPLAINT** |
| Plaintiff, | **Civil Action No.** |
| v. | **JURY TRIAL DEMANDED** |
| FREDERICK J. HANNA & ASSOCIATES, P.C., JAN THOMAS, CARL DANIELS, WILLIAM J LAU, Ms. HARRIS, and Ms. WILLIAMS, | |
| Defendants. | |

---

## COMPLAINT

## I.   INTRODUCTION

1.      This action is brought by Plaintiff Rochelle Bromund for actual and statutory

damages against Defendants Frederick J. Hanna & Associates, P.C., Jan Thomas, Carl Daniels,

William J. Lau, Ms. Harris, and Ms. Williams,  for violation of the Fair Debt Collection Practices

Act, 15 U.S.C. §§1692 *et seq.* (hereinafter referred to as "FDCPA"), which prohibits debt

collectors from engaging in abusive, deceptive, and unfair practices, and related common law

claims.

2.      Congress made the finding that "Abusive debt collection practices contribute to

the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of

individual privacy." 15 U.S.C. § 1692(a).

## II.   JURISDICTION

3.      Jurisdiction of this court arises under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

Jurisdiction over the state law claims is available pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this district as all relevant events took place here.

## III.  PARTIES

4.      Plaintiff Rochelle Bromund is an individual who resides in Lake Villa, Illinois.

5.      Ms. Bromund's former surname was Henderson.

6.      Plaintiff is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a(3).

7.      Defendant Frederick J. Hanna & Associates, P.C. (hereinafter referred to as "Hanna") is a collection agency, law firm and corporation organized under the laws of the State of Georgia located at 1427 Roswell Road, Marietta, Georgia.

8.      Hanna is engaged in the collection of debts from Illinois consumers using the mail and telephone.

9.      Hanna regularly attempts to collect consumer debts alleged to be due to another.

10.      Hanna was and is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

11.      Defendant Jan Thomas is or was an employee and/or agent of Hanna.

12.      Jan Thomas, which may be a fictitious name, is or was engaged in the collection of debts from Illinois consumers using the mail and/or telephone.

13.      Jan Thomas regularly attempts to collect consumer debts alleged to be due to another.

14.      Jan Thomas was and is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

15. Defendant Carl Daniels, which may be a fictitious name, is or was an employee and/or agent of Hanna.

16. Carl Daniels is or was engaged in the collection of debts from Illinois consumers using the mail and/or telephone.

17. Carl Daniels regularly attempts to collect consumer debts alleged to be due to another.

18. Carl Daniels was and is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

19. Defendant William J. Lau, which may be a fictitious name, is or was an employee and/or agent of Hanna.

20. William J. Lau is or was engaged in the collection of debts from Illinois consumers using the mail and/or telephone.

21. William J. Lau regularly attempts to collect consumer debts alleged to be due to another.

22. William J. Lau was and is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

23. Defendant Ms. Harris, which may be a fictitious name, is or was an employee and/or agent of Hanna.

24. Ms. Harris is or was engaged in the collection of debts from Illinois consumers using the mail and/or telephone.

25. Ms. Harris regularly attempts to collect consumer debts alleged to be due to another.

26.     Ms. Harris was and is a "debt collector" as defined by the FDCPA, 15 U.S.C.

§1692a(6).

27.     Defendant Ms. Williams, which may be a fictitious name, is or was an employee

and/or agent of Hanna.

28.     Ms. Williams is or was engaged in the collection of debts from Illinois consumers

using the mail and/or telephone.

29.     Ms. Williams regularly attempts to collect consumer debts alleged to be due to

another.

30.     Ms. Williams was and is a "debt collector" as defined by the FDCPA, 15 U.S.C.

§1692a(6).

## IV.     <u>FACTUAL ALLEGATIONS</u>

31.     During or about November 2004 through November 2005, Ms. Bromund had a

Bank of American credit card that she used for personal, family, or household purchases.

32.     At some point around October 2005, Ms. Bromund became unable to make timely

payments toward her Bank of American credit card balance.

33.     When Ms. Bromund stopped making timely payments, her Bank of America

credit card account entered default (hereinafter referred to as "the Debt").

34.     After the Debt entered default, it was obtained by Hanna.

35.     On or about July 13, 2007, Hanna employee Jan Thomas called Ms. Bromund's

grandmother's residence and spoke with Ms. Bromund's grandmother Helen Southworth.

36.     Ms. Thomas told Ms. Southworth that Ms. Bromund had an account in litigation

and a court date.

37.     Ms. Thomas told Ms. Southworth that it was imperative that Ms. Bromund call Hanna immediately.

38.     Ms. Thomas told Ms. Southworth that she was a lawyer.

39.     Ms. Bromund had not lived at her grandmother's house since 1998.

40.     Ms. Bromund's grandmother called her to relay the message from Hanna. Both Ms. Bromund and Ms. Southworth were very concerned by the message from Hanna.

41.     Ms. Bromund had never heard of Hanna and did not know why she would have a court date or any litigation filed against her.

42.     Ms. Bromund had not received anything stating that she had litigation against her or a court date.

43.     On July 16, 2007, Ms. Bromund called Hanna and spoke with Ms. Thomas.

44.     Ms. Thomas told Ms. Bromund that she had an account placed with Hanna that was going to go to litigation.

45.     Ms. Bromund asked about the court date. Ms. Thomas stated that if she had not called, Hanna would have taken her case to court.

46.     Ms. Bromund asked what Ms. Thomas was calling about. Ms. Thomas referred to the Bank of America credit card account (the Debt).

47.     At that point, Ms. Bromund wondered why Hanna would call her grandmother's house. The debt collectors who had obtained the Debt prior to Hanna had all called Ms. Bromund on her cellular telephone. No previous debt collector contacted Ms. Bromund's grandmother regarding the Debt.

48.     Ms. Thomas asked if Ms. Bromund wanted to make settlement arrangements.

49.     Ms. Bromund told Ms. Thomas that she was working with a debt relief agency. Ms. Thomas stated that they "don't work with third parties or debt consolidation companies."

50.     Ms. Bromund told Ms. Thomas that she would have to think about it and call Hanna back.

51.     Ms. Bromund called Bank of America to verify that the Debt was sent to Hanna.

52.     Ms. Bromund was told by Bank of America that the account was sold to Hanna.

53.     Ms. Bromund called Hanna and spoke to Ms. Thomas.

54.     Ms. Bromund stated that she was paying another company to take care of the Debt for her. Ms. Thomas stated that Hanna will not accept that payment.

55.     Ms. Thomas stated that if Ms. Bromund did not pay the Debt Hanna will sue her or garnish her wages.

56.     Ms. Bromund decided to discuss a settlement. Ms. Thomas stated she would have another Hanna representative call Ms. Bromund to set it up.

57.     During the telephone conversation, Ms. Thomas stated, "we're all attorneys that work here."

58.     Ms. Bromund was very concerned that she would have litigation filed against her if she did not pay the Debt even though she had been paying a debt relief company.

59.     On July 19, 2007, Hanna employee Carl Daniels called Ms. Bromund and offered to accept a total of $6,300.00 to settle the Debt as paid in full, with $6,000.00 to be paid up front. Ms. Bromund accepted Hanna's offer.

60.     Ms. Bromund called Mr. Daniels back because she realized she could only afford to pay $5,000.00 up front. Mr. Daniels stated that $5,000.00 was acceptable.

61.     By correspondence dated July 19, 2007, Hanna arranged for the preparation and transmittal of a letter to Ms. Bromund in an attempt to collect the Debt.

62.     Hanna's July 19, 2007, letter to Ms. Bromund memorialized her agreement with Mr. Daniels, in that she would make an initial payment of $5,000, and two payments of $650.00 each.

63.     Hanna's July 19, 2007, letter to Ms. Bromund is signed by William J. Lau, Director of Operations.

64.     On July 24, 2007, Ms. Bromund called Hanna and spoke with Mr. Daniels. Mr. Bromund told him that she would not be able to send the $5,000.00 payment until August. Mr. Daniels stated that was acceptable.

65.     By correspondence dated July 24, 2007, Hanna arranged for the preparation and transmittal of a letter to Ms. Bromund in an attempt to collect the Debt.

66.     Hanna's July 24, 2007, letter to Ms. Bromund stated that a post-dated check in an unstated amount would be deposited on July 31, 2007.

67.     Hanna's July 24, 2007, letter to Ms. Bromund is not signed, but contains in its closing, "Bill Lau, Director of Operations."

68.     Although Ms. Bromund had planned to mail to Hanna a check in the amount of $5,000.00 (not post-dated), she decided to mail a certified bank check to Hanna.

69.     Ms. Bromund did not agree to send Hanna a post-dated check.

70.     Ms. Bromund did not send Hanna a post-dated check.

71.     Ms. Bromund did not provide Hanna with her bank account information.

72.     In early August 2007, Ms. Bromund mailed a Chase Bank certified check to

Hanna in the amount of $5,000.00.

73.     On or about August 3, 2007, Hanna deposited the $5,000.00 check.

74.     By correspondence dated August 22, 2007, Hanna arranged for the preparation and transmittal of a letter to Ms. Bromund in an attempt to collect the Debt.

75.     Hanna's August 22, 2007, letter to Ms. Bromund stated that a post-dated check in an unstated amount would be deposited on August 31, 2007.

76.     Hanna's August 22, 2007, letter to Ms. Bromund is not signed, but contains in its closing, "Bill Lau Director of Operations."

77.     Ms. Bromund did not send Hanna a post-dated check.

78.     Ms. Bromund did not provide Hanna with her bank account information.

79.     On or about September 28, 2007, Ms. Thomas called Ms. Bromund at her place of employment.

80.     Ms. Thomas stated that they had to make payment arrangements for the remaining $1,300.00 of the settlement they had agreed upon. Ms. Bromund suggested three monthly payments of $433.33, to which Ms. Thomas agreed.

81.     Ms. Bromund asked if, after her third and final $433.33 payment, the Debt would be removed from her credit report. Ms. Thomas stated that it would be removed.

82.     Ms. Thomas took Ms. Bromund's first payment of $433.33 over the telephone with Ms. Bromund's Chase Circuit City Visa credit card.

83.     On or about October 30, 2007, Ms. Thomas called Ms. Bromund at her place of employment. Ms. Bromund made her second payment of $433.33 over the telephone with Ms. Bromund's Chase Circuit City Visa credit card.

84.     Ms. Thomas told Ms. Bromund that "you have one more payment and this will be closed."

85.     On or about November 20, 2007, Hanna employee Ms. Harris called Ms. Bromund at her residence.

86.     Ms. Harris told Ms. Bromund that her account was in litigation and that she had a court date. Ms. Bromund asked why and was told that she had not made consistent payments. Ms. Bromund stated that she had receipts showing her payments were made on time and that she only needed to make her last payment of $433.33 per the agreement with Mr. Thomas. Ms. Harris stated that her records did not indicate those payment arrangements. Ms. Thomas did not have the authority to make those payment arrangements.

87.     Ms. Bromund requested to speak with a manager. Ms. Harris put Mr. Daniels on the telephone.

88.     Mr. Daniels told Ms. Bromund that she had not made consistent payments and so the offer was voided. Mr. Daniels stated that a check for $150.00 bounced. Ms. Bromund stated that she did not send a check for $150.00. She told Mr. Daniels that Mr. Thomas agreed to accept three monthly payments of $433.33. Mr. Daniels stated they would have to have a meeting with Ms. Thomas regarding why she would make such payment arrangements.

89.     During the November 20, 2007, telephone conversation with Ms. Bromund, Mr. Daniels was extremely rude and disrespectful toward her.

90.     Hanna did not send Ms. Bromund a letter or other written notice indicating that a $150.00 check of hers had bounced.

91.     The night after the November 20, 2007, telephone conversation with Mr. Daniels,

Ms. Bromund suffered sleep problems. Ms. Bromund also suffered stomach pains and a migraine headache as a result of the telephone conversation.

92.     On November 21, 2007, Ms. Bromund called Hanna and spoke with Ms. Harris.

93.     Ms. Bromund asked Ms. Harris for the status of her account. Ms. Harris stated that "we are going to meet with Ms. Thomas and discuss the agreement she made with you."

94.     Ms. Bromund asked to speak to a manager. Ms. Harris offered to have Ms. Daniels speak with Ms. Bromund. Ms. Bromund told Ms. Harris that Mr. Daniels had been very rude, unhelpful, and had made her sick. Ms. Harris stated that there was no one else she could speak to.

95.     Ms. Bromund asked to speak to Mr. Daniels' boss. Ms. Harris provided the name Carl Brown and his telephone number.

96.     Ms. Bromund asked why they were not upholding the agreement. Ms. Harris told Ms. Bromund that if should would "stop yappin'" she could get to the meeting with Ms. Thomas to find out. Ms. Thomas stated that they would get back to her.

97.     During the telephone conversation, Ms. Harris stated, "we're all attorneys that work here."

98.     On November 26, 2007, Ms. Harris called Ms. Bromund at her place of employment.

99.     Ms. Harris stated that she, "the attorneys", Mr. Daniels, and Ms. Thomas finished their meeting and decided that the agreement would not be upheld. Ms. Bromund asked why and was told, "Ms. Thomas doesn't have the authority to make that kind of decision for payment arrangements. The balance is back to the original amount minus what you have already paid.

Because you have been delinquent the offer gets voided.

100.     Ms. Bromund stated that she had made her payments on time and had the receipts. Ms. Harris stated that collection law states that agreement offers are valid for only sixty days. Ms. Bromund expressed her disagreement. Ms. Harris stated that nothing more can be done except to make a payment for the new balance. She then said that the new balance must be paid over time; no settlement amount will be offered. Ms. Bromund stated she would not pay the full balance.

101.     For the duration of the day, evening, and overnight, including while she was at her place of employment, Ms. Bromund suffered a migraine headache and stomach pains.

102.     Ms. Bromund was unable to sleep during the night after the November 26, 2007, telephone call.

103.     On November 28, 2007, Ms. Harris called Ms. Bromund at her place of employment.

104.     Ms. Harris extended to Ms. Bromund a settlement offer on the new balance of $10,456.25. Ms. Harris stated that Hanna would agree to accept $3,136.00 in three payments of $1,045.33. Ms. Bromund refused.

105.     Ms. Bromund asked why Hanna was treating her like that and why the agreement with Ms. Thomas was not being honored by Hanna. Ms. Harris stated that "action has been taken with Ms. Thomas" and Hanna "is sorry for the mixup."

106.     Ms. Bromund expressed her skepticism that Ms. Harris was authorized to offer payment arrangements. She asked to speak with Ms. Thomas. Ms. Harris stated that Ms. Bromund could not speak with Ms. Thomas and that she was able to offer these payment

arrangements. Ms. Bromund stated that she would not agree to any offers other than the one she had already made.

107.     Ms. Bromund ended the telephone conversation and called Mr. Brown. Mr. Brown was not available but Ms. Bromund spoke with a Hanna employee who could not find her file. Ms. Bromund asked for Mr. Brown to call her back. Mr. Brown did not call her back.

108.     On November 29, 2007, Hanna employee Ms. Williams called Ms. Bromund nine times between 11:58 am and 6:51pm, four times on her cellular telephone, three times on her work telephone, and twice on her home telephone. Ms. Williams left message after six of the nine calls. The messages stated that Ms. Williams wanted to go over another settlement arrangement with Ms. Bromund.

109.     During each of the messages that Ms. Williams left for Ms. Bromund on November 29, 2007, Ms. Williams identified herself as the "Litigation Department Manager."

110.     Ms. Bromund answered one of the calls from Ms. Willams. Ms. Williams identified herself as the "Litigation Department Manager."

111.     Ms. Williams offered a settlement of $4,182.50 and told Ms. Bromund that she had faxed the settlement offer it to her.

112.     Ms. Williams also offered a settlement of twenty-four monthly payments of $435.67.

113.     Ms. Bromund stated that she did not have $4,000.00. Ms. Williams told Ms. Bromund to ask the person who previously lent her $5,000 for more money. Ms. Williams said that "if they can get you that kind of money so fast they must have access to more." Ms. Bromund stated that it was none of her business.

114.    Ms. Bromund requested Hanna to send her a written statement explaining why the would not uphold the agreement with Ms. Thomas and a copy of all payments made by Ms. Bromund. Ms. Williams refused.

115.    Ms. Williams stated that if Ms. Bromund did not settle, Hanna would garnish her wages.

116.    Ms. Williams stated that Hanna can also take Ms. Bromund to court and sue her.

117.    Ms. Williams stated that Hanna would put a lien on Ms. Bromund's house for the entire balance.

118.    Ms. Williams stated that if Ms. Bromund did not have the money to pay she would face jail time and a fine.

119.    Ms. Williams stated that "we can do whatever we want to get a payment."

120.    Ms. Williams stated, "we're all attorneys that work here."

121.    By correspondence dated November 29, 2007, Hanna arranged for the preparation and transmittal via facsimile of a letter to Ms. Bromund in an attempt to collect the Debt.

122.    Hanna's November 29, 2007, letter to Ms. Bromund stated the balance of the Debt was $10,456.25.

123.    Hanna's November 29, 2007, letter to Ms. Bromund stated that Hanna's "client has authorized this office to settle this debt for the amount of $4182.50. Please have the funds in our office by NOVEMBER 30, 2007."

124.    Hanna's November 29, 2007, letter to Ms. Bromund is signed by William J. Lau, Director of Operations.

125.    After receiving Hanna's November 29, 2007, letter, Ms. Bromund called Ms.

Williams and left a message requesting a copy of any and all receipts of payments posted to her account and a statement from Hanna indicating why they cannot uphold the agreement made with Ms. Thomas.

126.    On November 29, 2007, Ms. Bromund mailed check # 1168 in the amount of $433.33. to Hanna.

127.    Hanna deposited Ms. Bromund's check # 1168 during December 2007.

128.    On November 30, 2007, Ms. Williams called Ms. Bromund at 8:41am and 8:43am, leaving messages both times.

129.    Ms. Bromund called Ms. Williams and asked for a statement of payments and an explanation of why Hanna would not honor the agreement reached with Ms. Thomas. Ms. Williams told Ms. Bromund she was misguided and that, if she continued to "dwell" on the past, Hanna would not be able to "help" her with the current balance that "is due now."

130.    Ms. Bromund asked why, if just one day prior on November 28, 2007, Ms. Harris offered to accept $3,136.00, Ms. Williams raised the amount to $4182.50 on November 29, 2007. Ms. Williams stated, "Ms. Harris is not in a position to make that offer."

131.    Ms. Bromund instructed Ms. Williams not to call her at home, work, on her cellular telephone, or any family members.

132.    Ms. Williams stated that she was trying to help and that Ms. Bromund's "attitude" was not going to get her anywhere. Ms. Williams ended the telephone conversation.

133.    On November 30, 2007, Ms. Bromund instructed Ms. Williams not to call her at her place of employment again.

134.    On December 29, 2007, Ms. Williams called Ms. Bromund at her place of

employment and left a message stating that they need to go over her account.

135.    On January 2, 2008, Ms. Bromund called Ms. Williams.

136.    Ms. Williams stated that she had an email from Mr. Hanna stating that he spoke to Bank of America, that they have reviewed the account, and that they determined that because the payments were too far apart, the settlement was voided. Ms. Bromund requested a copy of the email from Mr. Hanna. Ms. Williams stated that she did not have a copy of it.

137.    Ms. Bromund told Ms. Williams that she had mailed her final payment of $433.33 and it was cashed by Hanna. Ms. Williams stated that she did not have a record of her payment.

138.    Ms. Williams asked if Ms. Bromund would make payment arrangements. Ms. Bromund declined because her final payment had been cashed by Hanna.

139.    Ms. Bromund suffered a migraine headache and stomach pains as a result of the January 2, 2008, telephone conversation.

140.    Hanna communicated inaccurate information about the Debt to Bank of America and/or Portfolio Recovery Associates.

141.    As a result of Defendants' conduct, Ms. Bromund suffered emotional distress as a result of Defendants' conduct.

142.    As a result of Defendants' conduct, Ms. Bromund suffered several migraine headaches as a result of Defendants' conduct.

143.    As a result of Defendants' conduct, Ms. Bromund required medication as a result of the migraine headaches.

144.    As a result of Defendants' conduct, Ms. Bromund suffered stomach pains as a result of Defendants' conduct.

145.    As a result of Defendants' conduct, Ms. Bromund suffered several sleepless nights as a result of Defendants' conduct.

146.    As a result of Defendants' conduct, Ms. Bromund required medication to aid her in sleeping.

147.    As a result of Defendants' conduct, Ms. Bromund suffered anxiety.

148.    As a result of Defendants' conduct, Ms. Bromund suffered appetite loss.

149.    As a result of Defendants' conduct, Ms. Bromund suffered loss of concentration.

150.    As a result of Defendants' conduct, Ms. Bromund suffered irritability.

151.    As a result of Defendants' conduct, Ms. Bromund suffered nausea.

152.    As a result of Defendants' conduct, Ms. Bromund would become nervous, upset, and sick to her stomach every time the telephone rang.

153.    As a result of Defendants' conduct, Ms. Bromund experienced difficulty in sitting for periods of time and would need to go for a walk.

154.    As a result of Defendants' conduct, Ms. Bromund would cry.

155.    As a result of Defendants' conduct, Ms. Bromund suffered emotional distress.

156.    As a result of Defendants' conduct, Ms. Bromund feared that Hanna would garnish her wages.

157.    As a result of Defendants' conduct, Ms. Bromund feared that legal action would be taken against her by Hanna.

158.    As a result of Defendants' conduct, Ms. Bromund feared that Hanna would place a lien on her home.

159.    As a result of Defendants' conduct, Ms. Bromund feared that Hanna would have

her put in jail.

160.    As a result of Defendants' conduct, Ms. Bromund experienced stress and tension between herself and her husband.

161.    Ms. Bromund's family observed her reactions from Defendants' conduct.

162.    As a result of Defendants' conduct, Ms. Bromund allowed all calls, both personal and work-related,  where caller ID did not identify the caller, to go to voicemail.

163.    Defendants' telephone calls to and messages left at her place of employment interfered with Ms. Bromund's ability to perform her job responsibilities.

164.    The above list and descriptions of telephone calls from Hanna to Ms. Bromund and messages left by Hanna for Ms. Bromund at her home and place of employment are not exhaustive, nor comprehensive. Within the past twelve months, Hanna made multiple telephone calls to Ms. Bromund at her home and place of employment and left multiple messages for Ms. Bromund at her home and place of employment. The date, time, substance, and content of all telephone calls made during the past twelve months by Hanna to Ms. Bromund at any location and messages left by Hanna for Ms. Bromund at any location are adopted herein.

165.    During each telephone communication with Hanna and its employees and/or agents, the natural consequence of Hanna's conduct was to harass, oppress, or abuse Ms. Bromund.

166.    At no point did Hanna initial legal action against Ms. Bromund.

**V.    COUNT ONE – FAIR DEBT COLLECTION PRACTICES ACT**

167.    Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs.

168.    Defendants' violations of the FDCPA include, but are not limited to:

A.    communicating to any person other than the consumer that such consumer owes any debt in violation of 15 U.S.C. § 1692b(2);

B.    communicating with the consumer at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer in violation of 15 U.S.C. § 1692c(a)(1);

C.    communicating with the consumer at the consumer's place of employment when the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication in violation of 15 U.S.C. § 1692c(a)(3);

D.    engaging in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt in violation of 15 U.S.C. § 1692d;

E.    using obscene or profane language or language the natural consequence of which is to abuse the hearer or reader in violation of 15 U.S.C. § 1692d(2);

F.    causing the telephone to ring or engaging in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number in violation of 15 U.S.C. § 1692d(5);

G.    using any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer in violation of 15 U.S.C. §§ 1692e and e(10);

H.    creating a false sense of urgency in violation of 15 U.S.C. § 1692e;

I.    falsely representing the character, amount, or legal status of any debt in violation of 15 U.S.C. § 1692e(2)(A);

J.    falsely representing or implying that any individual is an attorney or that any communication is from an attorney in violation of 15 U.S.C. § 1692e(3);

K.    representing that the nonpayment of any debt will result in the arrest or imprisonment or any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action in violation of 15 U.S.C. § 1692e(4);

Page 18

L.      threatening action that cannot legally be taken or that was not intended to be taken in violation of 15 U.S.C. § 1692e(5);

M.      falsely representing or implying that the consumer committed any crime or other conduct in order to disgrace the consumer in violation of 15 U.S.C. § 1692e(7);

N.      communicating to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed in violation of 15 U.S.C. § 1692e(8);

O.      using unfair or unconscionable means to collect or attempt to collect any debt in violation of 15 U.S.C. § 1692f;

P.      attempting to collect any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law in violation of 15 U.S.C. § 1629f(1);

Q.      taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest in violation of 15 U.S.C. § 1692f(6)(A);

R.      taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if there is no present intention to take possession of the property in violation of 15 U.S.C. § 1692f(6)(B); and

S.      contradicting and/or overshadowing the right to dispute the alleged debt within thirty (30) days of the receipt of the validation notice in violation 15 U.S.C. § 1692g(a).

## VI.      COUNT TWO – INTRUSION UPON SECLUSION

169.    Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs.

170.    Defendants' abusive and intrusive acts constituted intrusion upon Plaintiff's seclusion.

171.    Defendants intentionally intruded upon the solitude or seclusion, private affair or

concerns of Plaintiff.

172.    The intrusion was substantial, and of a kind that would be highly offensive to an ordinarily reasonable person

173.    The intrusion caused Plaintiff to sustain injury, damage, loss or harm in the form of emotional distress mentioned above.

174.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages in an amount to be determined by proof and a finder of fact at trial.

175.    Defendants' intimidating tactics were not an aberration.  Defendants have a history or plan of abusive and unlawful debt collecting similar to the events herein.

176.    Defendants acted with oppression, fraud, and/or malice, thereby entitling Plaintiff to punitive damages in an amount according to proof and a finder of fact at trial.

## VII.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff Rochelle Bromund requests that judgment be entered in her

favor against Defendants Frederick J. Hanna & Associates, P.C., Jan Thomas, Carl Daniels,

William J. Lau, Ms. Harris, and Ms. Williams for:

  A.      Actual damages pursuant to 15 U.S.C. § 1692k(a)(1) and common law;

  B.      Statutory damages pursuant to 15 U.S.C. § 1692k(a)(2);

  C.      Punitive damages;

  D.      Declaratory judgment that Defendants' practices violate the FDCPA;

  E.      Costs and reasonable attorney fees pursuant to 15 U.S.C. § 1692k(a)(3);

          and

  F.      For such other relief as the Court may find to be just and proper.

## VIII.    JURY DEMAND

Plaintiff Rochelle Bromund hereby demands that this case be tried before a Jury.

             s/ Craig M. Shapiro
             Craig M. Shapiro
             O. Randolph Bragg
             HORWITZ, HORWITZ & ASSOCIATES, LTD.
             25 East Washington Street Suite 900
             Chicago, Illinois 60602
             (312) 372-8822
             (312) 372-1673  (FAX)

             ATTORNEYS FOR PLAINTIFF ROCHELLE BROMUND